UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD A. WENZEL,

                    Plaintiff,                              Case Number 06-11031

v.                                                  Honorable David M. Lawson

RICHLAND TOWNSHIP and DONALD
VOORHEIS,

                    Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT, GRANTING PARTIAL SUMMARY
JUDGMENT TO DEFENDANT RICHLAND TOWNSHIP, AND DISMISSING
TELECOMMUNICATIONS ACT COUNT OF THE AMENDED COMPLAINT**

The plaintiff, Ronald A. Wenzel, filed a complaint, later amended, under the Telecommunications Act of 1996 and state law theories alleging that defendant Richland Township violated his rights by denying a special use permit that would have allowed the plaintiff's lessee to erect a cellular telephone tower on his property. After a series of public hearings, the Township concluded that erection of the 179-foot tower on Wenzel's property would be unsafe because it would interfere with the flight path of aircraft that landed at a private airport located on adjacent land owned by defendant Donald Voorheis. The plaintiff moved for partial summary judgment, and the Court heard oral argument in open court on August 9, 2006, at which time the Court denied the motion as to the counts alleging substantive and procedural due process violations, regulatory taking, and violation of the state constitution because fact issues precluded summary judgment for the plaintiff as a matter of law. The motion was taken under advisement as to the Telecommunications Act count. The Court now finds that the defendant Township's decision to deny the special use permit is supported by substantial evidence on the record, and the plaintiff is

not entitled to relief under the Telecommunications Act as a matter of law. The motion for summary judgment, therefore, will be denied.

### I.

The plaintiff, Ronald Wenzel, owns a 37-acre parcel of land located in a rural part of Saginaw County near the town of Hemlock, Michigan. Wenzel entered into an option contract to lease part of the land to New Cingular Wireless, a cellular telephone company that intended to build a cellular telephone tower on the land. Because of the requirements of the local zoning ordinance, a special use permit is required before the tower can be built.

Defendant Donald Voorheis owns the land to the west of the plaintiff's parcel. Voorheis says that he has been operating a private airport on his property for at least fifteen years. He maintains a single turf runway about 2,200 feet in length, which is aligned in a northeast-southwest direction. He has outbuildings, including airplane hangars, located on his land. The runway is used by light general aviation aircraft primarily for recreational purposes. The glide path of aircraft landing to the southwest is over Wenzel's land and would be proximate to the proposed location of the cell phone tower.

New Cingular Wireless PCS, not a party to this case, provides cellular phone service and has a license from the Federal Communications Commission to operate in the region. There is an area in Richland Township that currently does not receive service from New Cingular, and New Cingular wants to build additional towers to provide coverage. New Cingular performed a study in which it identified the plaintiff's property as an optimal location for a cell phone tower. The plaintiff describes the prime location for a tower as the "search ring."

On August 24, 2005, the plaintiff negotiated a one-year option with New Cingular Wireless PCS to allow it to build a tower on his property.  The option expired on August 24, 2006, but the parties have informed the Court that it has been extended.  The plaintiff's property is zoned as an "A-2" area (Agricultural Dispersed Residential), which does not allow cell phone towers as a permitted use.  Similarly, Voorheis's use of his land as an airport does not conform to the present zoning ordinance, but because the use existed before the enactment of the ordinance, Voorheis's use "may be continued so long as it remains otherwise lawful." Richland Twp. Ord. § 401(2).  In either case, both cell phone towers and airports are allowed if the property owner obtains a special use permit.  Richland Twp. Ord. § 803(8), (10).

The procedure for applying for a special use permit involves two steps: "First is the review of the Site Plan for the proposed use.  Second is the decision of whether or not a Special Use Permit will be granted." Richland Twp. Ord. § 1402.  The Ordinance sets out the following standard:

> (1) Standards.  During the Special Use Permit Process, various considerations will be explored before approval for the Site Plan or the Special Use Permit.  Some of these are defined in this Chapter as additional site plan review standards for various Special Uses. These standards are intended to reduce the impact of a Special Use on surrounding Properties.  They are minimum requirements and must always be met.
> (2) Conditions.  The Planning Commission may attach additional conditions to the approval of the Site Plan or the Special Use permit.  These conditions must be based on requirements or concerns defined by this Ordinance.
> (3) Precaution.  No person should conclude that compliance with the standards defined by this Chapter automatically grant the right to establish a special Use [sic] in a given Zoning District.  Rather, the privilege of establishing a Special use [sic] is granted or denied by the Planning Commission following the process outlined in this Chapter.  This process includes notification of nearby residents and property owners who may voice their opinions at a public hearing before a decision is made to grant a Special Use Permit.  Since Special Uses generally impose physical, visual or psychological impacts on neighboring parcels, the input of neighboring residents or property owners is a legitimate factor for the Planning Commission to consider when deciding whether to allow such uses.
> . . .

-3-

(c) Consideration of a Special Use Permit.  Following the public hearing, the Planning Commission Chairman shall accept a motion for approval, conditional approval, or denial of the Special Use Permit.  Planning Commission members shall then discuss the motion and vote upon it.

Richland Twp. Ord. § 1402.

The Ordinance also has a provision specifically dealing with radio and cell phone towers:

SECTION 1414.  WIRELESS COMMUNICATION ORDINANCE
Authorization.  Changing technology in the field of communications has resulted in a reliance upon more versatile convenient forms of communication.  Businesses, individuals and government have all developed a strong dependence upon the ability to quickly contact others.  The use of radios and cellular phones have proven themselves over and over again in emergency situations.
(1) Qualifying conditions
. . .
(b) Special Performance Standards
. . .
11.  Communication towers in excess of one hundred seventy-five (175') feet in height above grade level shall be prohibited within two (2) miles of a public airport property boundary or a ½ mile radius of a helipad.
. . .
21.  Height of the tower shall not exceed one hundred seventy-five (175') feet from the grade within all applicable districts.
22.  Towers shall not be artificially lit unless required by the Federal Aviation Administration.

Ord. § 1414.

In September 2005, New Cingular submitted a special use application to the Township to erect a cell phone tower on Wenzel's land.     On October 4, 2005, the Richland Township Planning Commission held a public hearing on the application.  The meeting minutes contain the following report about the hearing:

PUBLIC HEARING: Chairman Bauer stated the Public Hearing was being held relative to Special Use Request by Ronald Wenzel to place a 175' lattice telecommunications tower along with placement of a 12' x 20' prefabricated equipment shelter at the base of the tower for New Cingular Wireless on his property . . . .  The property is zoned A-2 Agricultural.  Notice of the Public Hearing was published in The Township Times and sent to neighboring property owners as

required by the Interim Zoning Ordinance. No written correspondence was received. Mr. Wenzel and representatives from Haley Law Firm representing New Cingular Wireless were available to answer questions. Points of discussion: is lighting required (regulated by FAA and MDOT), no guide wires required, lease is for 25 years, location concerns near private air strip, request a self supporting monopole tower in place of the self supporting lattice tower as proposed. Two parties voiced objections to granting the special use permit.

Def. Twp.'s Resp. Ex. A, Twp. Record at 25. The public hearing was adjourned, and at its regular meeting the Planning Commission unanimously agreed to postpone consideration of the permit pending "further information regarding FAA approval, change in location with buffer yard requirements, self supporting monopole tower instead of the lattice tower, accessory structure designed to be aesthetically compatible." *Id.* at 26.

On October 25, 2005, the Township received a letter from Cingular containing additional information about the permit application. The letter contained the following statements:

1. Lighting: The revised site plans depict a 175' tall monopole. Typically lighting is not required on a tower under 200' and due to the fact that the nearest registered airport is 9.5 miles north of the [tower site] Cingular is confident that this tower will not require a light. Cingular has been made aware of a private airstrip on adjacent property, however, this landing strip which is owned by Mr. Voorheis does not have lighting for flying at night and therefore will not effect [sic] whether Cingular's tower will require a light. The FAA and MDOT applications have been filed by Cingular wireless. A copy of the FAA 1A certification that has been filed with these agencies is attached. Once these approvals are obtained the application will be filed with Tri-City Area Joint Airport Zoning Board.

2. Landing strip/change of tower placement: According to the FAA no private landing strip has been registered with the FAA and no application for approval had previously been filed. Cingular has learned that subsequent to the October 4, 2005 meeting, Mr. Voorheis has apparently applied with the FAA for clearance of his landing strip. It is also our understanding that no zoning approval was ever granted to Mr. Voorheis in regard to the extension of his landing strip. However, in an effort to show Cingular's good faith to accommodate Mr. Voorheis desire to use his land for a landing strip once he has received his local and federal approvals, it has voluntarily moved its lease area 525' southeast from the previously proposed site.

*Id.* at 27.

On November 1, 2005, the Planning Commission held another meeting. Prior to the meeting, defendant Voorheis asked other community members to come to the meeting to oppose the permit. He circulated a "petition" in opposition to the erection of the tower, which was signed by fifteen people. The November 1, 2006 meeting minutes contain the following information:

> PUBLIC COMMENT: Wallace Haley, Haley Law Firm, answered questions and presented the proposed updated site plan for placement of a 175' monopole telecommunications tower. Don Voorheis submitted a petition to save "Ernie's Field", a private airstrip now registered as such, stating the proposed tower would be a safety hazard proposing placement out a mile radius from the end of the airstrip. Others present opposing the tower location voiced safety issues as pilots who also use the private airstrip, "light" pollution, placement of tower in their front yard, safety issues, in general, for the airstrip.
>
> SPECIAL USE REQUEST: The special use permit along with the revised site plan was reviewed for placement of a 175' monopole communications tower for New Cingular Wireless on the Ronald Wenzel property . . . . Discussion held. Questions were raised and answered. Motion by Fred Clark, second by David Schafer to table the special use permit request to the next Commission meeting for further information regarding the following issues: lighting, search ring, location (all options), making a final decision at the next meeting. Unanimous vote. Motion carried.

*Id.* at 40.

On December 29, 2005, the plaintiff sent a letter to the Planning Commission:

> 1. In regards with my conversations with the Michigan Transportation Airport Management Examination, Aeronautical Division, Mr. Ryan Riesinger . . . referred me to Bob Riffel airport inspector. He told me that Mr. Donald Voorhies is to maintain an altitude of 500 feet over my property. Mr. Voorhies only has a grass airstrip – not an airport.
>
> Mr. Riffel has absolutely no material dealing with Mr. Voorhies applications and etc. There are no laws to protect Mr Voorhies when he is flying. He is responsible for everything dealing with the plane he is flying. If he was to fly into the tower he is completly [sic] responsible for all damages and there are no 45 degree angles as he was telling the Commission. I, Ronald Wenzel, do not have to guarantee him anything. It is my property. Mr. Riffell said I can put a tower anywhere I choose on my property because Voorhies must maintaine [sic] the 500 feet.
>
> If Mr. Voorhies does want to fly lower over my property he must purchase or lease air space. This is a federal and state law. An example of this law: recently the Harry Brown Airport purchased air space from Arthur Hoff, who owns farm land across the

road from the airport.  The sale or lease has to be approved by the FAA according to their rules and regulations.
2. I then had a conversation with Mr. Mark Grennell, Tall Structures, same Division as Mr. Riffel, in regards to airports . . . .  He told me that a tower of 175 feet is of no concern as the pilot is to be above 500 feet.
Mr. Lynn Smith is also in the department, I did not talk to him . . . .
3. . . . Airport management requires planes to be able to take off and land in 20 degrees.  Planes used for spraying must have received permission from the FAA before spraying.  There are regulations for gas and use of chemicals.
Ronald A. Wenzel.

Def. Twp.'s Resp. Ex. A, Twp. Record at 65.  That same day, Mr. Wenzel also sent a letter to the

Township Board:

> On October 4, 2005, twice mentioned by Mr. Don Voorhies . . . a very nice individual; he claimed to have made extensive and expensive $20,000 improvements to his landing strip in section 25.
> This grass airstrip is not listed with the FAA or the Michigan Transportation Aeronautic Division as of the forth [sic] week of December 2005.
> In the November meeting of the Planning Commission, in reference to this excavation and building site and the addition of another piece of property to the airstrip site, we learned he had not applied for special permits for the moving of dirt and trees.
> Additional land for the airstrip was bought from Mrs. B Wascher in late September 2005 after the Cingular Cell Tower people had submitted a special permit for the cell tower.  This was an attempt to stop the tower construction – This is clearly EX POST FACTO.  He is claiming it is dangerous to him even if he has to fly 500 feet above my property.
> 1. According to the rules and bye laws [sic] Mr. Voorhies should be pentalized [sic] for not securing permits and 2.[sic] the property for the grass airstrip put on the Township Tax role?  Please give details and what actions completed.
> 2. Were personal property taxes placed on the air stripe [sic], facilities and air planes [sic]?  Please give details and actions to be completed.

*Id.* at 66.

Some time prior to the January 3, 2006 Planning Commission meeting, Voorheis provided

the Commission with some documents he purportedly received from Linn Smith in the Airports

Division of the Michigan Department of Transportation.  One page purports to summarize the

restrictions for structures located near runways:

-7-

> From any edge of the runway out to 1400' no structures at all
> from 1400' to 3000' no structures over 150' tall
> outside of 3000' tower height by FAA ok
> in 20 to 1 transition area no structure out to 3000'

Def. Twp.'s Resp. Ex. A, Twp. Record at 52. In his reply brief, the plaintiff alleges that Voorheis

altered the notes and wrongfully attributed them to Mr. Smith.

Another meeting was held on January 3, 2006. The official minutes contain the following

information:

> PUBLIC COMMENT REGARDING SPECIAL USE REQUEST – CELL TOWER: Extensive public comment was received concerning this special use request. Wallace Haley, Haley Law Firm, presented additional information as requested by the Commission, regarding lighting requirement (not required) and the search ring and was available to answer questions for the proposed site plan for placement of a 175' (actual height is 179' with antennas) monopole telecommunications tower for New Cingular Wireless on the Ronald Wenzel property . . . . Ronald Wenzel stated he had land owner rights. Don Voorheis stated the proposed tower would be a safety hazard. Others present opposing the tower location voiced safety issues as pilots who also use the private airstrip, placement of tower in their front yard, safety issues, in general, for the airstrip.
>
> SPECIAL USE REQUEST – CELL TOWER: The special use permit along with the site plan was reviewed for placement of a 175' monopole communications tower for New Cingular Wireless on the Ronald Wenzel property . . . . Discussion held. Questions were raised and answered.
>
> Mr. Bauer [a commission member] explained [that] safety is a valid concern and criteria for the Planning Commission to consider when it is reviewing a request for a Special Use Permit. Mr. Bauer also explained that the Planning Commission does not have any special expertise on what tower heights or locations may be safe near airfields. Mr. Bauer noted that the Planning Commission had received extensive input from the applicant, Mr. Wenzel, from the Haley Law Firm representing Cingular Wireless, and from neighboring property owners.
>
> Many neighboring property owners opposed the application on aesthetic grounds and because they believed the tower would adversely affect the value of their property. Mr. Vorrheis [sic], a neighboring property owner who has a private landing strip on his property immediately to the West of the proposed tower site, stated that the proposed communications tower would be a significant safety hazard to himself and the other private pilots who use this landing strip. Mr. Voorheis submitted to the Planning Commission information and drawings he said he had received from the Michigan Department of Transportation. Mr. Haley pointed out that the Michigan Department of Transportation regulations are not applicable

-8-

because the airfield on Mr. Voorheis' property is a private landing strip and not a public airport. Other pilots expressed concern about the danger posed by a tower located so near the runway.

Mr. Bauer reported that he and the Zoning Administrator had contacted the Aeronautics Commission of the Michigan Department of Transportation ("MDOT") and consulted with its Tall Structures Specialist ("MDOT Specialist") on at least three occasions. Mr. Bauer also reported that the MDOT Specialist had informed Mr. Bauer that MDOT would not permit a tower over 150 feet in height within 5,000 feet of a runway. The MDOT Specialist also stated that there are additional height restrictions imposed depending on the structure's proximity and orientation to the runway. Structures located directly off the end of runways may not be more than 1 foot in height for each 20 feet of distance from the runway, and structures adjacent to the runway may not be more that [sic] 1 foot in height for each 7 feet of distance from the runway. The MDOT Specialist also informed Mr. Bauer that it is his opinion that it is not safe to permit a tower over 150 feet in height within 5,000 feet of a runway. The MDOT Specialist confirmed that MDOT does not have jurisdiction in this matter because the airfield is a private landing strip and not a public airport.

Mr. Bauer pointed out and corrected the inaccuracies in the information provided by Mr. Voorheis, and clarified for the Planning Commission the position, recommendations and opinions of the MDOT Specialist. Mr. Haley acknowledged that if the Voorheis landing strip was regulated by MDOT, the MDOT safety regulations would not permit a tower over 150 feet in height within 5,000 feet of this type of runway. Mr. Haley also acknowledged that the actual height of the proposed tower, with antennas, was 179 feet and not 175 feet. Mr. Haley also agreed that the proposed location of the tower was within 5,000 feet of the private landing strip runway.

All members of the Planning Commission, except Mr. Neuenfeldt, expressed concerns about safety and indicated that, although the MDOT regulations do not apply to or regulate land around a private landing strip, they do provide useful guidelines that help the Planning Commission understand what tower heights and locations pose little or acceptable safety concerns. Members Bauer, Clark, Frederick and Turner all expressed the opinion that it appears to be a safety hazard to permit the construction of a 179 foot tower within 5,000 feet of the private landing strip. Members Clark, Frederick and Turner each indicated that they were voting to deny the application because they believe that the construction of a 179 foot tower this close to a runway would create an unacceptable safety hazard.

Motion by Fred Clark, second by Brian Frederick, to deny application for the special use request for placement of a 175' monopole communications tower on property owned by Ronald Wenzel . . . . Roll call vote Clark, yes; Neuenfeldt, no; Turner, yes; Frederick, yes; Bauer, no. (3) yeas, (2) nays. Motion carried.

-9-

*Id.* at 71-72.  The Township has submitted an affidavit by Mr. Bauer swearing that the meeting

minutes accurately reflect what took place at the meeting.  Bauer also explained in his affidavit that

he voted against the motion to deny the application outright, despite his presentation that the

proposed tower presented a hazard to aircraft, because he believed the plaintiff should be given the

opportunity to show that a shorter tower might accommodate safety concerns.  The plaintiff has

submitted what he claims is a prior draft of the minute meetings that does not contain the five

paragraphs prior to "Motion by Fred Clark."  Dkt # 26, Ex. R, Pl.'s Record at 66.

Yet another meeting was held on February 7, 2006.  At the meeting, the plaintiff's current

attorney spoke to the Planning Commission.  The minutes state,

> DANIEL RUSCH, ATTY. – SHINNERS & COOK, P.C. – Mr. Rusch introduced
> himself and indicated he was representing Mr. Ron Wenzel.  Mr. Wenzel's request
> for a special use permit (submitted in conjunction with Cingular Wireless) was
> denied by the Planning Commission at its January 3, 2006 meeting.  Mr. Rusch asked
> to address the Planning Commission to raise certain objections Mr. Wenzel had with
> the Planning Commission's decision to deny his request for a special use permit.
> The Planning Commission agreed to listen to Mr. Rusch's presentation.
> Mr. Rusch pointed out that Mr. Voorheis was not living at the Gratiot Road address
> at the time of the application.  Mr. Rusch presented photos of 500 N. Fordney, parcel
> number 22-12-2-26-1013-000, the property Mr. Voorheis purchased on September
> 15, 2005, after the Cingular/Wenzel application was submitted.  Mr. Rusch voiced
> concerns that decision was based on the full runway, including newly purchased 500
> N. Fordney, as well as that comments given during the "Public Comment" portion
> of the January 3 meeting suggest that other pilots are using runway.  Mr. Rusch
> argued that use of the runway should be limited to Mr. Voorheis.
> Mr. Bauer pointed out and corrected the inaccuracies in the information provided by
> Mr. Rusch.  Mr. Bauer clarified for Mr. Rusch that the Planning Commission had
> only considered the original landing strip, and that 500 N. Fordney Road property
> was not considered by the Planning Commission in its January 3, 2006 decision.  Mr.
> Bauer further pointed out that the private airstrip designation and the prohibition on
> "Commercial Use" would not preclude Mr. Voorheis from allowing other pilots to
> use the landing strip.  Mr. Voorheis had stated at the January 3, 2006 meeting that
> he does not charge for any services.
> Mr. Rusch argued that since Mr. Voorheis should be the only pilot using the landing
> strip, the proposed cell tower would not pose a significant risk because Mr. Voorheis
> would be very familiar with the location of the tower.  Mr. Rusch then presented

aerial photos which he said illustrate a 1400' radius from the original landing strip, showing that there are many residents' homes within the radius, which Mr. Voorheis has no problem avoiding. Mr. Rusch also argued that the Planning Commission did not consider the property rights of Mr. Wenzel, but only the rights of the surrounding property owners.

Mr. Bauer again pointed out that the "private airstrip" language of the ordinance would not prohibit Mr. Voorheis from permitting other pilots to use the landing strip. Mr. Bauer emphasized that the Planning Commission did balance the respective property rights of the applicant and the surrounding property owners. Mr. Bauer also stated that the majority of the Planning Commission considered the potential safety concerns a significant issue. Mr. Bauer explained that the regulations of the Michigan Aeronautics Commission, and the recommendations provided by the Michigan Department of Transportation (MDOT) Tall Structures Specialist provided useful information and guidance to help the Planning Commission understand what tower heights and locations would be safe near a private landing strip. Mr. Bauer pointed out that the majority of the Planning Commission believed that the construction of a 175' – 179' cell tower within 5,000 feet of a private landing strip would constitute an unacceptable safety hazard. Mr. Bauer indicated that the name of MDOT Tall Structure Specialist was Lynn [sic] Smith.

Mr. Rusch asked whether the Planning Commission had ruled on the proposed site plan for the cellular tower, and if not, why the Planning Commission had not made such a determination concerning the site plan. Mr. Bauer indicated that the proposed Cingular site plan, along with the request for a special use permit, had been tabled at the October 4, 2005 meeting, in accordance with the requirements of the Township's Zoning Ordinance. The law firm representing Cingular did present additional site plan information at the January 3, 2006 meeting. Mr. Bauer explained that the primary focus of the Planning Commission at the November and January meetings was on whether or not the request for a special use permit should be granted. Mr. Bauer also explained that he and the Planning Commission had several concerns about the revised site plan, which the Planning Commission put on hold until the issue of the special use request was decided. Mr. Bauer acknowledged that the Zoning Ordinance does permit the Planning Commission to approve a site plan subject to the issuance of the special use permit, but pointed out that once the Planning Commission voted to deny the request for special use permit, it was unnecessary for the Planning Commission to revisit its concerns about the site plan. The site plan could not be approved once the Planning Commission had voted to deny the special use permit.

Mr. Rusch then requested that the Planning Commission reconsider its decision on Mr. Wenzel's request for a special use permit. Mr. Bauer pointed out that the Township's Zoning Ordinance does not provide for a procedure that permits the Planning Commission to reconsider its decision to deny an applicant's request for a special use permit. Therefore, Mr. Bauer indicated that the Planning Commission would not entertain any request for reconsideration or take any official or formal action to reconsider its decision to deny Mr. Wenzel's request for a special use

-11-

permit. However, Mr. Bauer, Mr. Clark, Mr. Frederick, Mr. Schafer and Mr. Turner unofficially and informally indicated that the significant safety concerns posed by a 175' – 179' tower within 5,000 [feet] of the runway would not permit the approval of such a special use permit.

WRITTEN NOTICE: Motion by David Schafer, second by Brian Frederick, to incorporate the following into the written decision of the Planning Commission concerning the New Cingular Wireless Special Use Application to erect a monopole telecommunications tower: At the January 3, 2006 meeting (i) the Planning Commission considered Mr. Wenzel's rights as a property owner along with neighboring property owners' rights, (ii) the Planning Commission considered only the original private air strip owned by Mr. Don Voorheis; (iii) the original Voorheis landing strip was a legal pre-existing use; and (iv) Mr. Lynn [sic] Smith was the MDOT Tall Structures Specialist consulted by the Zoning Administrator and the Planning Commission Chairman.  Roll call vote Clark, yes; Neuenfeldt, no; Turner, yes; Schafer, yes; Frederick, yes; Bauer, yes.  (5) yeas, (1) nay.  Motion carried.

MINUTES OF PREVIOUS MEETING: Motion by Gary Turner, second by Brian Frederick, the Minutes of the January 3, 2006 to be approved and filed with the [corrections mentioned above].  Also, add to "Public Comment" after "he had land owner rights" Mr. Wenzel submitted three letters (see attached) to the Planning Commission.  Joel F. Wardin commented with regard to potential liability risks to Richland Township.  Unanimous vote.  Motion carried.

Def. Twp.'s Resp. Ex. A, Twp. Record at 77-79.

On April 4, 2006, the Planning Commission held a meeting at which it adopted the written decision denying the special use permit.  The written decision reads as follows:

DECISION OF THE RICHLAND TOWNSHIP PLANNING COMMISSION WITH RELATION TO NEW CINGULAR WIRELESS' SPECIAL USE APPLICATION TO ERECT A MONOPOLE TELECOMMUNICATIONS TOWER

WHEREAS, New Cingular Wireless c/o Haley Law Firm submitted an application for a special use permit to allow New Cingular Wireless to erect a telecommunications tower on Ronald Wenzel's property, 13970 Gratiot Road ("Special Use Application"), and Ronald Wenzel acknowledge that he had landowner rights to said property;

WHEREAS, a public hearing was held on October 4, 2005 on New Cingular/Ronald Wenzel's application for a Special Use Permit and to review his Site Plan at which Wallace Haley, attorney for New Cingular Wireless, was present to answer questions concerning the proposed telecommunications tower;

WHEREAS, on October 4, 2005, following the close of the public hearing, the Richland Township Planning Commission ("Commission") opened its regular meeting, at which the Commission reviewed and considered Mr. Wenzel's Special Use Application along with the Site Plan for placement of a 175' lattice

telecommunications tower along with placement of a 12' X 20' prefabricated equipment shelter at the base of the tower for New Cingular Wireless on the property referenced hereinabove;

WHEREAS, at the October 4, 2005 Commission meeting, Fred Clark motioned, Bernard Neuenfeldt seconded, and the Commission approved the tabling of the special use permit request, along with the proposed site plan, until the November meeting so that the following information could be ascertained: FAA approval, change in location with buffer yard requirements, self-supporting monopole tower instead of the lattice tower, and the aesthetic compatibility of an accessory structure with surrounding structures;

WHEREAS, at the November 1, 2005 meeting of the Commission, the Commission reviewed the Special Use Application along with the revised site plan placement for the proposed 175' – 179' communications tower for New Cingular Wireless on the Wenzel property;

WHEREAS, at the November 1, 2005 public meeting, Bernard Neuenfeldt motioned, David Schafer seconded, and the Commission approved the tabling of the special use permit request, along with the proposed site plan, to the December 6, 2005 Commission meeting so that Mr. Wenzel and Cingular could research the following concerns of the Commission: tower lighting, search ring, and alternative locations;

WHEREAS, Mr. Haley requested a month's extension with relation to consideration and discussion on the Special Use Application and site plan review, and the Commission granted Cingular's request for an extension until the January 3, 2006 meeting;

WHEREAS, at the January 3, 2006 meeting of the Commission Don Voorheis, a neighboring property owner who has a private landing strip on his property immediately to the west of the proposed tower site, stated, as he had at the two previous meetings, that the proposed communications tower would be a significant safety hazard to himself and the other private pilots who use this landing strip;

WHEREAS, Commission Chairman Brian Bauer reported that he and the Richland Township Zoning Administrator had contacted the Aeronautics Commission of the Michigan Department of Transportation ("MDOT") and consulted with its Tall Structures Specialist, Mr. Lynn [sic] Patrick Smith, on at least three occasion[s] prior to the January 3, 2006 meeting concerning the advisability of erecting a telecommunications tower near a private landing strip;

WHEREAS, Mr. Bauer reported the MDOT's Tall Structure Specialist had informed Mr. Bauer that MDOT jurisdiction does not extend to private landing strip; however, he further informed Mr. Bauer that a telecommunications tower would raise the same safety concerns for a private landing strip as for a public runway.

WHEREAS, Mr. Bauer reported that MDOT's Tall Structure Specialist had also informed him that MDOT would not permit a tower over 150 feet in height within 5,000 feet of a runway and that there are additional height restrictions imposed depending on the structure's proximity and orientation to the runway;

WHEREAS, Mr. Bauer reported that structures located directly off the end of runways may not be more than 1 foot in height for each 20 feet of distance from the

-13-

runway, and structures adjacent to the runway may not be more than 1 foot in height for each 7 feet of distance from the runway;

WHEREAS, Mr. Bauer further reported that the MDOT's Tall Structures Specialist informed him that it is his opinion that it is not safe to permit a tower over 150 feet in height within 5,000 feet of a runway;

WHEREAS, Mr. Haley acknowledged that if the Voorheis landing strip was regulated by MDOT, the MDOT safety regulations would not permit a tower over 150 feet in height within 5,000 feet of this type of runway and that the proposed location of the tower was within 5,000 feet of the private landing strip runway;

WHEREAS, the Planning Commission considered only the original private landing strip in making its decision and excluded from its consideration the newly acquired property which was used to extend the runway;

WHEREAS, the Planning Commission determined that the original landing strip is a legal pre-existing use;

WHEREAS, all members of the Commission, except Mr. Neuenfeldt, expressed concerns about safety and indicated that, although the MDOT regulations do not apply to or regulate land around a private landing strip, they do provide useful guidelines that help the Commission understand what tower heights and locations pose little or acceptable safety concerns;

WHEREAS, many private pilots expressed concern to the Commission about the danger posed to pilots and their planes by a tower located so near the runway;

WHEREAS, the health, safety, and welfare of the public are valid concerns and criteria for the Commission to consider when it is reviewing a request for a special use permit;

WHEREAS, Members Bauer, Clark, Frederick and Turner all expressed the opinion that it appears to be a safety hazard to permit the construction of a 175' – 179' tower within 5,000 feet of the private landing strip and Members Clark, Frederick and Turner each indicated that they were voting to deny the application because they believe that the construction of a 175' – 179' tower this close to a runway poses an unacceptable safety hazard,

It is therefore the decision of the Richland Township Planning Commission to DENY the Special Use Application to erect a 175' – 179' telecommunications tower on the Ronald Wenzel property, 13970 Gratiot Road, parcel number 22-12-2-25-2003-000, on the basis that the proposed tower creates an unacceptable risk of danger to human life and property.

*Id.* at 82-83. Under the Township's rules, that decision is not appealable to the Zoning Board of Appeals: "The Board [of Appeals] is not empowered to overturn decisions of the Planning Commission regarding Special Use Permits." Ord. §1509 (13)(l). The plaintiff then commenced this multi-count action and filed his motion for summary judgment.

-14-

II.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

Congress has stated that the purpose of the Telecommunications Act is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56; *see Reno v. American Civil Liberties Union*, 521 U.S. 844, 857 (1997). The Act creates a cause

-15-

of action for "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph." 47 U.S.C. § 332(c)(7)(B)(v).

Under a prior draft of a Senate Bill, Congress proposed the creation of a national commission to develop uniform policies for the siting of wireless communications towers. *See* 141 Cong. Rec. H9954 (daily ed. Oct. 12, 1995) (Reading S.652, Telecommunications Competition and Deregulation Act of 1995, at § 108 Facilities Siting). *Cf. PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F. Supp. 2d 1052, 1058 (N.D. Ill. 1998). In its final version, however, the Act preserves the prerogative of local zoning authorities, noting that "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). "The TCA does not preempt all authority of state or local governments over the regulation of wireless towers. *See* 47 U.S.C. § 332(c)(7)(A). Instead, it merely imposes several substantive and procedural requirements upon the state or local government's consideration of permit applications." *Tenn. ex rel. Wireless Income Prop., LLC v City of Chattanooga*, 403 F.3d 392, 398 (6th Cir. 2005).

The Act, however, circumscribes state or local government regulation by outlawing actions that (1) unreasonably discriminate among providers of functionally equivalent services or (2) prohibit or have the effect of prohibiting the supplying of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i). The Act also states that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

-16-

47 U.S.C. § 332(c)(7)(B)(iii).  The plaintiff in this case contends that the Township's  decision is not supported by substantial evidence in the written record.

The court of appeals has "stated that 'the "substantial evidence" standard of section 332 is the traditional standard employed by the courts for review of agency action.' . . . Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *New Par v. City of Saginaw*, 301 F.3d 390, 396 (6th Cir. 2002) (quoting *Telespectrum, Inc. v. Public Serv. Comm'n of Kentucky*, 227 F.3d 414, 423 (6th Cir. 2000), and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The plaintiff's main argument is that the Township improperly relied on information furnished by Linn Smith from the Airports Division of the Michigan Department of Transportation.  The plaintiff contends that Smith's statements amounted to hearsay, if he were subjected to cross-examination before the Planning Commission he may have expressed a different opinion, and Smith's actual opinion is that towers sometimes are allowed within 5,000 feet of an airport runway when a special air space study (SASS) is conducted.  The plaintiff also argues that Donald Voorheis misled the Commission by submitting documents that he drafted so as to appear that they came from Smith.  Finally, the plaintiff insists that the Commission's rationale is internally inconsistent because the statement that "MDOT would not permit a tower over 150 feet in height within 5,000 feet of a runway" cannot be reconciled with the statement that "structures located directly off the end of runways may not be more than 1 foot in height for each 20 feet of distance from the runway, and structures adjacent to the runway may not be more than 1 foot in height for each 7 feet of distance from the runway."  Def. Twp.'s Resp. Ex. A, Twp. Record at 82-83.  The plaintiff believes that

because the proposed location for the tower is 2,074 feet southeast of the north end of the runway, use of the 7:1 ratio would permit a structure 296 feet tall.

The Court finds that none of these arguments undercuts the conclusion that the Planning Commission's decision for the Township is supported by substantial evidence as required by the Telecommunications Act. The Township had evidence that building a tower over 150 feet within the prescribed distance of a landing strip presented a safety hazard. Even in the context of the Telecommunications Act, it has been recognized that concern over air traffic safety is a legitimate basis to restrict the placement of cell phone towers. *See Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 57 (1st Cir. 2001) (observing that "[f]or line-of-sight technologies to work, they must be tall enough to be above sources of interference, which often means that they must be on hills or otherwise located in prominent locations. Local radio transmitters can create interference for cellular signals, while the proximity of a location to airports can place absolute restrictions upon the height of any tower").

In this case, a specialist with the state whose helps decide whether tall structures are safe near airports told a member of the Commission, Brian Bauer, that such towers are not permitted unless a special study is done. The plaintiff says that Bauer never mentioned to the Commission that prohibition of 150-foot towers within 5,000 feet of an airport was not absolute. However, that point is irrelevant because the plaintiff never conducted such a study. Moreover, the Commission heard arguments from the plaintiff's attorney informing it of the details of Bauer's conversation with Smith, and the Commission members did not change their minds.

The written decision of the Planning Commission makes clear that it was not basing its decision on state airport regulations, but rather it used those regulations as guidelines to make its

-18-

own safety assessment.  The Commission had evidence of a safety hazard, and it had no evidence that it is safe to put up a tower as close to a runway as the plaintiff proposed.  Although the plaintiff argued to the Township that Mr. Voorheis should not be flying airplanes over his land, that issue was not before it, and the Planning Commission had no authority to stop Mr. Voorheis from doing so, since his airstrip was a legal non-conforming use.  The Township gave the plaintiff ample opportunity to submit information, and it went out and did its own research.  The Commission's decision is not arbitrary; it is supported by evidence in the record.

Mr. Voorheis may indeed have attempted to mislead the Commission about his own conversation with Mr. Smith.  However, the Commission does not appear to have relied exclusively on what it heard from Mr. Voorheis.  Mr. Bauer went out and spoke with Mr. Smith himself and he related the information he received in a fair and accurate manner.  The potentially wrongful behavior on Mr. Voorheis' part cannot be attributed to bad faith on the part of the Commission.

Next, there is no rule that prevents the Commission from relying on hearsay in making its decision.  As the defendant points out, the Federal Rules of Evidence do not apply to decisions by the Richland Township Planning Commission.  Administrative agencies may use hearsay to decide cases.  *See R.P. Carbone Const. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 819 (6th Cir. 1998).  Moreover, it would be impractical to require such an entity to receive sworn testimony for every decision.  The Commission recognized its limited expertise in matters of air traffic safety and reasonably relied on Mr. Bauer, its chairman, to report what he learned from the MDOT specialist.  As the court of appeals has noted in the context of assessing the adequacy of the written record in such matters, "'Passage of the TCA did not alter the reality that the local boards that administer the zoning laws are primarily staffed by laypeople.  Though their decisions are now

-19-

subject to review under the TCA, it is not realistic to expect highly detailed findings of fact and conclusions of law.'" *Omnipoint Holdings, Inc. v. City of Southfield*, 355 F.3d 601, 606 n.5 (6th Cir. 2004) (quoting *Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 59 (1st Cir. 2001)).

Finally, and contrary to the plaintiff's argument, the Township's decision is not based on conflicting statements. Although the plaintiff finds the statement that the MDOT prohibits towers exceeding 150 feet within 5,000 feet of a runway to be inconsistent with the height-and-distance gradients contained in the record, the Township's attorney clarified the restrictions at Mr. Smith's deposition:

> Q. Okay. So you use the twenty to one ratio really until you get to 150 foot and then from that point to 5,000 feet out it's a 150 foot max, correct?
> A. Correct.

Def. Twp.'s Resp. Ex. C, Smith Dep. at 28.

The Court finds that the decision of Richland Township to deny a special use permit for the erection of a cell phone tower on the plaintiff's land is supported by substantial evidence on the record and therefore complies with section 332(b)(7)(iii) of the Telecommunications Act. The existence of substantial evidence *vel non* is the only contested issue with respect to count I of the amended complaint, the plaintiff's Telecommunications Act count. Although the Township did not move for summary judgment on this count, the Court believes that it is appropriate to resolve this count now and grant summary judgment to the Township. "[W]hen a party has moved for summary judgment, and the Court agrees that there is no genuine dispute of material fact, but believes that judgment as a matter of law is appropriate for the non-moving party, the Court is free to so declare." *Markva v. Haveman*, 168 F. Supp. 2d 695, 706-07 (E.D. Mich. 2001) (noting further that "when one party moves for summary judgment, that party is considered to have sufficient notice of the

imminence of summary judgment in some form") (citing Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 346 (1998)).

<div align="center">III.</div>

As stated on the record at the motion hearing, the Court finds that fact issues preclude summary judgment for the plaintiff on all counts of his amended complaint save count I, which is based on the Telecommunications Act of 1996. As to that count, the Court determines that substantial evidence supports the decision of the Richland Township Planning Commission to deny the plaintiff's application for a special use permit.

Accordingly, it is **ORDERED** that the plaintiff's motion for partial summary judgment [dkt #29] is **DENIED** for the reasons stated herein and on the record.

It is further **ORDERED** that summary judgment is granted to defendant Richland Township as to count I of the amended complaint based on the Telecommunications Act of 1996, and that count is **DISMISSED WITH PREJUDICE**.

<div style="margin-left:40%">

s/David M. Lawson

DAVID M. LAWSON
United States District Judge

</div>

Dated: October 10, 2006

<div align="center">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on October 10, 2006.

s/Felicia M. Moses
FELICIA M. MOSES

</div>